J-S62045-17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.I.-R.E., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.J.E., MOTHER | : | No. 916 MDA 2017 |

Appeal from the Decree Entered May 9, 2017
in the Court of Common Pleas of York County
Orphans' Court at No(s): 2016-0125a

| | | |
|---|---|---|
| IN RE: ADOPTION OF O.N.-M.M., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.J.E., MOTHER | : | No. 918 MDA 2017 |

Appeal from the Decree Entered May 9, 2017
in the Court of Common Pleas of York County
Orphans' Court at No(s): 2016-0126

BEFORE:     STABILE, MOULTON, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:          **FILED NOVEMBER 09, 2017**

T.J.E. (Mother) appeals from the decrees entered on May 9, 2017, that granted the petitions of York County Office of Children, Youth & Families (CYF) to terminate involuntarily Mother's parental rights to A.I.-R.E. (A.E., born in December 2003) and O.N.-M.M. (O.M., born in October 2006) (Children, collectively).  We affirm.

In May 2014, CYF became involved with the family due to concerns of lack of food in the home, domestic violence perpetrated against Mother by her boyfriend, and Mother's drug use.  As part of a safety plan, Mother arranged

*Retired Senior Judge assigned to the Superior Court.

for Children stay to with two different family friends. In June 2014, Mother entered Roxbury Treatment Center to address substance abuse and mental health concerns, but she was discharged sixteen days later after engaging in inappropriate relationships at the facility. After her discharge, she remained in need of trauma therapy and intensive outpatient counseling for drug use. Mother had housing, but she was facing eviction and had no gas or electricity in the home. Mother was unemployed and Children's medical insurance had expired.

Due to the foregoing, on July 11, 2014, the juvenile court authorized CYF to remove Children and their younger sibling[1] from Mother pursuant to an emergency custody authorization. CYF officially placed Children in the homes of the respective family friends with whom they had been staying. Later that same month, the juvenile court adjudicated Children dependent pursuant to the Juvenile Act, 42 Pa.C.S. §§ 6301-6375. Children remained in separate foster homes until February 2015, when A.E. moved to the same foster home as O.M., where Children remain.

Initially, Mother made only minimal progress. She became homeless during the summer and was discharged from substance abuse counseling based upon lack of attendance. By 2015, however, Mother's progress increased to moderate. Mother was engaged with in-home and parenting

---

[1] This sibling is not part of the instant case. After the sibling's second removal from Mother, the court eventually awarded custody to the sibling's father.

- 2 -

services, visited consistently, and participated in Children's equine therapy.[2] In July 2015, Mother was discharged a second time from substance abuse and mental health counseling due to lack of attendance, but the following month she began mental health counseling with a different provider. After several positive drug screens, she tested negative for several months in a row. Mother obtained housing and began receiving social security disability income.

Nevertheless, there were some concerns about Mother's interactions with Children at visits. Mother was permitted partially-unsupervised visits in February 2015, but after she left Children in the care of their older brother in violation of a no-contact order, the visits reverted back to fully supervised.[3] During two visits in June 2015, Mother appeared dazed and incoherent. During other visits, she discussed inappropriate topics with Children. After visits became unsupervised again in October 2015, Children expressed concerns that Mother appeared to be intoxicated and permitted her paramour to attend visits without CYF's knowledge.

Visits eventually transitioned to overnight stays, and on February 23, 2016, the juvenile court returned Children and their younger sibling to Mother. Although CYF and Children's guardian *ad litem* requested that Children

---

[2] Children's equine therapy involved individual and family sessions with a mental health therapist and horses.

[3] Children's older brother is not part of the instant case. The record does not reveal whether the brother was still a minor, who had custody of him if he was a minor, or why the no-contact order was in place.

transition home slowly to institute appropriate services,[4] Mother wanted Children to be returned that day.

Reunification was short lived. By May 2, 2016, CYF removed Children and their younger sibling from Mother's care for a second time *via* emergency custody authorization. Unbeknownst to CYF until April 2016, Mother had ceased attending her trauma and substance abuse therapy in February 2016. CYF attempted to drug screen Mother at her home, but Mother was not available on multiple occasions despite statements from Children that Mother and Children actually were at home when the screener arrived. On one occasion, the caseworker and Children observed Mother unable to stand and slurring her words. Children missed some school days and equine therapy appointments, and Mother failed to schedule an intake appointment for mobile therapy. According to Children, Mother angrily smashed kitchen chairs with a hammer, causing Children to flee in fear of being harmed. This erratic behavior, as well as physical discipline of Children's younger sibling that led to bruising, caused Children to have a fear of Mother deemed credible by the court. Accordingly, the juvenile court authorized CYF to remove Children and place them in the foster home of their prior foster mother.

---

[4] According to the CYF caseworker supervisor, Mother also declined in-home services just a week before Children were returned, stating it would be too much for her. N.T., 1/30/2017, at 67. Mother denied making this statement during her testimony, but the orphans' court credited the caseworker supervisor's testimony. Orphans' Court Opinion regarding A.E., 5/9/2017, at 35; Orphans' Court Opinion regarding O.M., 5/9/2017, at 37.

Subsequent to Children's second removal, Mother became homeless again and bounced around from place to place. CYF offered Mother $1,200 in financial assistance, but she did not utilize it. Mother eventually located housing with her sister-in-law, but she conceded the housing would be appropriate for Children only if her sister-in-law's family moved out. Mother's issues with substance abuse continued, as evidenced by a positive screen for oxycodone without a prescription, failure to screen consistently, and her admission to using marijuana as recently as December 2016.

After re-entering mental health treatment in June 2016, Mother made mild progress before transitioning to a new therapist in October 2016. Again, Mother made only mild progress and she was discharged in November 2016 after missing appointments. Thereafter, Mother attended one counseling session in early January 2017.

After Children's second removal, Mother did not show or was late for various visits. A visit in August 2016 ended early after Mother reported she felt ill and could not handle Children; another visit in December 2016 ended early after Mother badgered Children about the termination proceeding. On other occasions, caseworkers had to admonish Mother regarding her inappropriate conduct. Such conduct included Mother's shoving a family member out of the door in front of Children, Mother's questioning Children about adoption and not returning her calls, and Mother's aggressively confronting O.M., resulting in O.M.'s crying.

On October 20, 2016, CYF filed petitions to terminate involuntarily Mother's parental rights to Children. Hearings were held on December 19, 2016, December 23, 2016, January 6, 2017, January 30, 2017, and February 6, 2017.[5] Eighteen witnesses testified, including Children, Mother, Children's current foster mother, Children's former foster mother, the CYF caseworker supervisor, Children's equine therapist, O.M.'s individual therapist, the family's Court Appointed Special Advocate, a screener who administered drug screens to Mother, three providers of parenting and/or in-home services, and five therapists who provided drug and alcohol and/or mental health counseling

---

[5] Gillian Woodward, Esquire, represented Children in the dependency and termination of parental rights proceedings as guardian *ad litem*. After the hearings concluded, but prior to entry of the decrees, our Supreme Court issued **In re Adoption of L.B.M.**, 161 A.3d 172 (Pa. 2017), regarding appointment of counsel for children pursuant to 42 Pa.C.S. § 2313(a). Shortly thereafter, the orphans' court appointed Sherry Myers, Esquire, as legal counsel for Children, and directed Attorney Myers to review the record and confer with her clients. Order, 4/3/2017, at 1. After doing so, Attorney Myers advised the orphans' court that no further proceedings were necessary. She also submitted proposed findings of fact and conclusions of law advocating for termination of parental rights, advising the Court that Children do not wish to return to Mother's care and wish to be adopted by their current foster mother. Proposed Findings of Facts and Conclusions of Law, 5/2/2017, at ¶¶ 18-20. We observe this is the same position expressed by Attorney Woodward as guardian *ad litem*. On appeal, Attorneys Woodward and Myers join CYF's brief advocating for this Court to affirm the termination decrees.

to Mother.  On May 9, 2017, the orphans' court terminated Mother's parental rights to Children.[6]  This appeal followed.[7]

Mother presents two questions for this Court's consideration.[8]

[1.] Whether the [orphans'] court erred in terminating the parental rights of Mother pursuant to [sub]sections 2511(a)(2), (5) and (8) of the Adoption Act.

[2.] Whether the [orphans'] court erred in concluding that termination of parental rights would best serve the needs and welfare of Children pursuant to [sub]section 2511(b) of the Adoption Act.

Mother's Brief at 5 (suggested answers and unnecessary capitalization and article omitted).

We begin with our standard of review.

---

[6] The orphans' court also involuntarily terminated the parental rights of Children's respective fathers.  Neither father has filed his own appeal or participated in this appeal.

[7] Both Mother and the orphans' court complied with Pa.R.A.P. 1925.  The orphans' court adopted its May 9, 2017 opinions as its Rule 1925(a) opinions, which were issued separately for each child.

[8] The issues presented in Mother's brief are worded identically to the issues she raised in her Rule 1925(b) concise statement of matters complained of on appeal.  The orphans' court, CYF, Children's guardian *ad litem*, and Children's counsel urge us to quash Mother's appeal for failure to comply with Pa.R.A.P. 1925(b)(4)(ii).  Orphans' Court Opinion, 1/13/2017, at 1; Joint Appellee Brief at 2.  This rule requires that appellants "concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge."  Pa.R.A.P. 1925(b)(4)(ii).  Failure to comply with this rule results in waiver.  Pa.R.A.P. 1925(b)(4)(vii).  While Mother certainly could have opted to be more specific regarding her claims of error, we do not find the wording to be so lacking in specificity as to prevent identification of all pertinent issues for the judge, particularly given the straightforward statutory framework.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks

omitted).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007).

Here, the orphans' court determined that CYF met its burdens under

subsections (a)(2), (a)(5), and (a)(8) of 23 Pa.C.S. § 2511. "While the trial

court found that [CYF] met its burden of proof under each [sub]section

[referenced] above, we need only agree with its decision as to any one

- 8 -

subsection in order to affirm the termination of parental rights." ***In re B.L.W.***,

843 A.2d 380, 384 (Pa. Super. 2004).

We direct our focus to subsection (a)(8). The following are the

applicable portions of the governing statute.

> **(a)   General rule**.--The rights of a parent in regard to a child
> may be terminated after a petition filed on any of the
> following grounds:
>
> (8) The child has been removed from the care of the parent
> by the court or under a voluntary agreement with an
> agency, 12 months or more have elapsed from the date of
> removal or placement, the conditions which led to the
> removal or placement of the child continue to exist and
> termination of parental rights would best serve the needs
> and welfare of the child.
>
> * * *
>
> **(b) Other considerations**.--The court in terminating the rights
> of a parent shall give primary consideration to the developmental,
> physical and emotional needs and welfare of the child.  The rights
> of a parent shall not be terminated solely on the basis of
> environmental factors such as inadequate housing, furnishings,
> income, clothing and medical care if found to be beyond the
> control of the parent.  With respect to any petition filed pursuant
> to subsection (a)(1) … or (8), the court shall not consider any
> efforts by the parent to remedy the conditions described therein
> which are first initiated subsequent to the giving of notice of the
> filing                    of                    the                    petition.

23 Pa.C.S. § 2511.

We have summarized the requirements of subsection 2511(a)(8) as

follows.

> In order to terminate parental rights pursuant to 23 Pa.C.S.[]   §
> 2511(a)(8), the following factors must be demonstrated: (1) The
> child has been removed from parental care for 12 months or more

from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa. Super. 2003).

"Notably, termination under [subsection 2511(a)(8)] does *not* require an evaluation of [a parent's] willingness or ability to remedy the conditions that led to placement of [his or] children." *In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa. Super. 2006) (citations omitted) (emphasis in original). Subsection 2511(a)(8) represents the determination that "a parent's basic constitutional right to the custody and rearing of his [or her] … child is converted, upon the failure to fulfill … parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In the Interest of K.Z.S.*, 946 A.2d 753, 759-60 (Pa. Super. 2008) (quoting *In re B.N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004)).

Mother argues that the orphans' court should not have terminated her rights pursuant to subsection (a)(8) because she has remedied the conditions that led to the initial and subsequent placements of Children. Mother's Brief at 29. According to Mother, she has "housing [and] a legal source of income,

[and] has complied with her own counseling as well as the family counseling through equine therapy."[9] *Id.*

The orphans' court determined that termination was proper under subsection 2511(a)(8) because it has been over twelve months since Children were placed initially into foster care,[10] and, in that time, Mother has not remedied the conditions that led to Children's placement. Orphans' Court Opinion regarding A.E., 5/9/2017, at 50-54; Orphans' Court Opinion regarding O.M., 5/9/2017, at 53-58. In reaching this conclusion, the court emphasized Mother's repeated unsuccessful discharges from drug and alcohol and mental

---

[9] Mother also argues, *inter alia*, that her rights should not be terminated because she was not provided proper services when Children were reunified with her in February 2016. *Id.* at 30. This argument ignores Mother's refusal to accept in-home services just one week prior to Children's return and her rejection of CYF's plan to delay reunification until services could be instituted. Moreover, the juvenile court found that CYF made reasonable efforts to comply with the permanency plan at the hearing immediately following Children's emergency removal in May 2016, a finding which Mother did not appeal. Permanency Review Order, 6/28/2017, at 2.

Even assuming *arguendo* that CYF failed to make reasonable efforts towards reunification, the court may still terminate parental rights if the agency otherwise proves by clear and convincing evidence the existence of grounds and that termination best serves a child's needs and welfare. *In re D.C.D.*, 105 A.3d 662, 675 (Pa. 2014). Despite having multiple service providers over the course of two years to assist her with reunification, including substance abuse and mental health counseling, parenting coaching, and in-home teams, Mother failed to rectify all of the conditions leading to Children's removals.

[10] At the time the termination petitions were filed, Children had been out of Mother's care for twenty-five of the last twenty-seven months. Mother does not argue that the Children have not been removed for the applicable timeframe required by subsection (a)(8).

health programs, her failure to abstain from drug use, and her inability to maintain housing for sustained periods. *Id.* at 57. These determinations are supported by the record.

The record demonstrates that Children's initial removal was based upon domestic violence in Mother's home, Mother's drug use, her untreated and unstable mental health, and her unstable housing. N.T., 1/30/2017, at 5. Although Mother appeared to make enough progress after Children's initial 19 months in care to attempt reunification, it soon became clear that any progress Mother made was not enough to enable her to parent Children full-time, requiring Children's removal only two months after reunification. Like Children's first removal, their second removal in May 2016 involved concerns regarding mental health and drug use. Specifically, Mother stopped going to her mental health therapy, did not get Children to school and equine therapy consistently, failed to provide consistent drug screens, and engaged in erratic behavior. N.T., 1/30/2017, at 94, 126-27; Permanency Review Order, 6/28/2016, at 1-2, 4-6.

Similar problems continued to persist throughout Children's remaining time in foster care. Mother never demonstrated sustained housing stability. N.T., 1/30/2017, at 35-36, 197-98. Since February 2016, Mother failed to participate in sixteen drug screens and tested positive for oxycodone in June

2016 without providing a valid prescription.[11]  N.T., 12/23/2016, at 127-133.

Additionally, Mother admitted she began smoking marijuana again in December 2016.  N.T., 2/6/2017, at 26.

Despite Mother's contention that she is compliant with her mental health therapy, the record reveals Mother continued her pattern of stopping and re-starting treatment, thereby hindering any progress.  N.T., 1/6/2017, at 21-22, 53-55, 58-59.  Mother's last two therapists classified her progress as minimal, and the therapist who saw her in January 2017 opined that she needed to attend therapy weekly for at least three to six more months, and

---

[11] The orphans' court made a finding that "[s]ince February 2016 until the termination hearing, Mother tested positive for substances fourteen times. Five of those attempts were positive for either oxycodone, barbiturates, or 'benzos.'  The Agency verified a prescription twice in that time period." Orphans' Court Opinion regarding A.E., 5/9/2017, at 26; Orphans' Court Opinion regarding O.M., 5/9/2017, at 27.

This finding is not supported by the record.  Jill Egbert, a drug screener with Families United Network (FUN), testified that FUN successfully administered drug screens to Mother fourteen times between February and December 2016, not that Mother tested positive fourteen times.  N.T., 12/23/2016, at 126-27.  Ms. Egbert testified that during this timeframe, Mother tested positive for barbiturates once, benzodiazepines three times, and oxycodone once.  *Id.*  According to Ms. Egbert, Mother provided FUN with a valid prescription for barbiturates and benzodiazepines, but not oxycodone during that timeframe.  *Id.* at 127-31.

Nevertheless, the lack of record support for this finding is harmless error, as Mother admitted during her testimony that she resumed illegal drug use in December 2016, N.T., 2/6/2017, at 26, and the orphans' court relied upon Mother's admission as part of its subsection (a)(8) analysis.  Orphans' Court Opinion regarding A.E., 5/9/2017, at 54; Orphans' Court Opinion regarding O.M., 5/9/2017, at 57.

- 13 -

possibly longer. *Id.* at 23-24, 57-60. Although one of Mother's therapists opined that Mother did not pose a threat of harm towards Children, the therapist had never observed Mother with Children, and she conditioned her opinion upon Mother's having supervised contact only. *Id.* at 39-40, 44-46. The record reveals that Mother's mental health issues continued to impact her parenting, as Mother engaged in aggressive behavior in front of and towards Children at visits. N.T., 1/30/2017, at 45-47, 79; Permanency Review Order, 6/28/2016, at 2, 5.

Despite times of apparent progress, the record supports the finding that Mother has been unable to "sustain progress for any meaningful length of time." Orphans' Court Opinion regarding A.E., 5/9/2017, at 34; Orphans' Court Opinion regarding O.M., 5/9/2017, at 36. Mother remains incapable of caring for Children. We have repeatedly made clear that we "cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Thus, for the reasons cited *supra*, we conclude that the orphans' court did not err in finding that CYF established by clear and convincing evidence the elements of subsection 2511(a)(8). Accordingly, we turn to subsection 2511(b).

As noted *supra*, subsection 2511(b) provides, in relevant part: "The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child."

23 Pa.C.S. § 2511(b). We have explained the analysis under this subsection as follows.

> [Subs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Mother offers the following argument as to why the orphans' court erred in concluding that termination of Mother's rights best serves Children's needs and welfare.

> From the evidence of record, it is easily discernible that a strong bond exists between Mother and [C]hildren. In essence, termination of Mother's rights is in no way beneficial for [Children]. She is able to care for [Children] and meet all of their needs. Mother is bonded to [Children], loves them, has

> consistently maintained contact with them throughout the course of this matter and wishes for them to be returned to her. There is no evidence to support the conclusion of the [orphans'] court that Mother cannot meet [Children's] needs. Although Mother is not as financially stable as the foster parents and is unable to provide luxuries to [Children], she is able to meet their basic needs and said circumstances is [*sic*] not a basis to determine that it is in [Children's] best interest to terminate parental rights. There is an obvious bond between [Children] and Mother and to terminate that relationship would also terminate [Children's] relationship with extended biological family as well. Thus, termination of Mother's parental rights will not serve [Children's] best interests.

Mother's Brief at 32 (citation omitted).

In assessing whether termination best meets Children's needs and welfare, the orphans' court acknowledged Mother's love for Children, but properly noted that a parent's own feelings of love and affection for his or her child do not prevent termination of parental rights. Orphans' Court Opinion regarding A.E., 5/9/2017, at 54-55 (citing *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010)); Orphans' Court Opinion regarding O.M., 5/9/2017, at 58-59 (same). The orphans' court determined that credible evidence contradicted Mother's belief of the existence of a positive parent-child bond between her and Children. Orphans' Court Opinion regarding A.E., 5/9/2017, at 55; Orphans' Court Opinion regarding O.M., 5/9/2017, at 59.

Specifically, the orphans' court focused upon the effect of Mother's mental health, drug use, and instability upon Children, observing that Mother's behavior has caused Children to fear Mother and fear returning to their

previous living situation.[12] Orphans' Court Opinion regarding A.E., 5/9/2017, at 56; Orphans' Court Opinion regarding O.M., 5/9/2017, at 59-60. Children's equine therapist, who worked with A.E. for two years and with O.M. for a year and a half, testified that Children enjoy contact with Mother, but opined that if contact would stop, Children "would not fall apart." Orphans' Court Opinion regarding A.M., 5/9/2017, at 56; Orphans' Court Opinion regarding O.M., 5/9/2017, at 60. *See also* N.T., 1/6/2017, at 129. The orphans' court also emphasized Children's own testimony; Children "strongly and repeatedly expressed a desire to remain with" their foster mother and requested to be adopted.[13] Orphans' Court Opinion regarding A.M., 5/9/2017, at 56; Orphans' Court Opinion regarding O.M., 5/9/2017, at 60. Based on the foregoing, the

---

[12] Children provided specific testimony about their fears of Mother due to her behavior and their desire to have someone else present in the room when seeing Mother. N.T., 12/23/2016, at 157-75, 187-203. O.M.'s individual therapist also described O.M.'s expressions of fear of Mother and stressed O.M.'s need for stability. N.T., 12/23/2016, at 96, 97, 106, 112. Children also expressed fear of Mother and conflicting feelings regarding Mother to their equine therapist, who believes the situation with Mother has caused A.E. to withdraw at times and O.M. to experience nightmares, anger, and behavioral problems. N.T., 1/6/2017, at 84-86, 88, 94-95, 104, 107, 128, 161, 195.

[13] N.T., 12/23/2016, at 154, 173, 196-97, 203. In addition, A.E. expressed feeling safe with her foster mother and explained she feels she has a "better relationship" with her foster mother and "can trust her" more than Mother. *Id.* at 201. A.E. believes her foster mother will allow her to call or visit Mother, but if she would not, A.E. said she "wouldn't really care" and "she would be okay with it." *Id.* at 197. O.M. was not sure how she would feel if she was not able to see Mother again and said she did not know if Mother loved her. *Id.* at 168. O.M. sometimes gets "mixed up" and calls her foster mother "mom," which makes her "feel good." *Id.* at 175.

court determined terminating Children's relationship with Mother would not have a negative impact upon Children. *Id.*

In addition to examining the state of the bond and the effect upon Children of severing such bond, the orphans' court also examined other factors. With regard to safety, the orphans' court noted Mother's failure to "prioritize [Children's] safety over her own impulses," such as when Mother allowed Children to be around their brother despite a no-contact order, or when Mother brought Children to her home during an inspection for a possible black mold infestation. Orphans' Court Opinion regarding A.M., 5/9/2017, at 55; Orphans' Court Opinion regarding O.M., 5/9/2017, at 59. The court also considered Children's lengthy time in foster care without sustained progress by Mother. Orphans' Court Opinion regarding A.M., 5/9/2017, at 57; Orphans' Court Opinion regarding O.M., 5/9/2017, at 59-60.

In examining the relationship between Children and their foster mother, it is clear that the orphans' court did not compare the economic status of Mother and foster mother as Mother alleges. Instead, the court recognized that Children's foster mother "has provided [Children] with the safe, stable environment that Mother [and Children's fathers] have not demonstrated an ability to offer [Children]." Orphans' Court Opinion regarding A.M., 5/9/2017, at 57; Orphans' Court Opinion regarding O.M., 5/9/2017, at 61. Children's foster mother has ensured that Children's needs, including educational and therapeutic, are met on a daily basis. *Id.* The court found that Children are

doing well in their foster mother's care, and determined that O.M.'s behavior and grades significantly improved in her foster mother's care. *Id.* Children have expressed feeling safe with their foster mother. *Id.*

Based on the above, the orphans' court concluded that terminating Mother's parental rights best serves the needs and welfare of Children. We discern no error of law or abuse of discretion with this conclusion. There is abundant support in the record supporting the conclusion, and the orphans' court analyzed all of the pertinent factors. Therefore, the orphans' court properly entered decrees terminating Mother's parental rights to Children.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/9/2017